UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| SCHOONER CREEK FARM, ) <br> SARAH DYE, and DOUGLAS MACKEY ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> CITY OF BLOOMINGTON, INDIANA, ) <br> ) <br> And, ) <br> ) <br> JOHN HAMILTON, in his official capacity ) <br> As Mayor of the City of Bloomington, Indiana and ) <br> in his individual capacity, ) <br> ) <br> And, ) <br> ) <br> PAULA MCDEVITT, in her official capacity ) <br> as Administrator of the Bloomington Parks and, ) <br> Recreation Department in her individual capacity, ) <br> ) <br> And, ) <br> ) <br> MARCIA VELDMAN, in her official capacity ) <br> As the Program Coordination for the Bloomington ) <br> Community Farmers Market and in her individual ) <br> capacity, ) <br> ) <br> Defendants. ) <br> _____) <br> ) <br> CITY OF BLOOMINGTON, INDIANA, ) <br> ) <br> And, ) <br> ) <br> JOHN HAMILTON, in his official capacity ) <br> As Mayor of the City of Bloomington, Indiana and ) <br> in his individual capacity, ) <br> ) | Cause No. 1:20-cv-00518-RLY-DML |

| | |
|---|---|
| And, | ) |
| | ) |
| PAULA MCDEVITT, in her official capacity | ) |
| as Administrator of the Bloomington Parks and, | ) |
| Recreation Department in her individual capacity, | ) |
| | ) |
| And, | ) |
| | ) |
| MARCIA VELDMAN, in her official capacity | ) |
| As the Program Coordination for the Bloomington | ) |
| Community Farmers Market and in her individual | ) |
| capacity, | ) |
| | ) |
| Counter-claim Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| SARAH DYE, and DOUGLAS MACKEY, | ) |
| | ) |
| Counter-claim Defendants. | ) |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

This case arises out of Sarah Dye's and Douglas Mackey's participation as vendors at the 2019 Bloomington Community Farmers' Market. After non-parties to this litigation discovered Dye's and Mackey's white supremacist views, they went to the Market to protest against such views and urge the boycott of Dye's and Mackey's business known as Schooner Creek Farm. Dye and Mackey believe that the defendants had a duty to control the non-parties' conduct, did not do enough to stop the non-parties' protests, and even encouraged the protests. They filed this lawsuit to obtain nominal damages for the defendants' alleged violation of their federal constitutional rights and compensatory damages for the harm they believe the defendants allowed to be done to their business.

This lawsuit cannot move forward, however, because Dye and Mackey signed a contract in which they agreed not to sue the defendants and to hold harmless, waive, release, and discharge

2

the defendants from all claims and causes of action arising out of the Market's operation and their participation in the Market. By initiating and continuing to prosecute this lawsuit, Dye and Mackey have breached their contract with the City of Bloomington.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE[1]

The Bloomington Community Farmers' Market began on July 26, 1975. [Filing No. 39-2, at ECF p. 3 (2019 Farm Vendor Handbook ("Handbook"), section titled "Our History").] "Through its 45 years in existence, the Market has enriched the life of the community by providing a place for residents and visitors to come together in a festive atmosphere, to buy local produce and other farm products from those who produce them, to listen to music, meet friends and to enjoy a relaxing time in beautiful surroundings." [*Id.*]

Participation in the Market as a farm vendor is not a right, but rather a "privilege." [Filing No. 17-1, at ECF p. 2 (Contract, first unnumbered paragraph).] In 2019, farm vendors wishing to sell at the Market, were required to go through an application and selection process and sign a contract. [Filing No. 39-2, at ECF p. 5 (Handbook, section titled "Who Can Sell"); Filing No. 17-1, at ECF p. 2 (Contract, first unnumbered paragraph).]

After applying and being selected to participate in the 2019 Market, Dye and Mackey signed the 2019 Bloomington Community Farmers' Market Farm Vendor Contract ("Contract"). [Filing No. 17-1, at ECF p. 2-5.] In consideration for the privilege of participating in the 2019 Market as a farm vendor, they agreed, among other things, to the following terms:

---

[1] The defendants accept the facts alleged in the plaintiffs' complaint as true for purposes of this motion only.

* * * *

**8. COVENANT NOT TO SUE**
The Vendor will not institute any action or suit at law or in equity against the City or the City's agents or employees as a result of operations under this Agreement. The Vendor will not aid in the institution or prosecution of any claim for damages, costs, loss of services, expenses or compensation for or on account of any damages, loss or injury to person or property as a result of operation under this Agreement.

* * * *

**10. LIABILITY AND INDEMNIFICATION**
The Vendor is solely responsible for damages from the sale of unsafe and unsound goods. The Vendor is solely responsible for damages or personal injury resulting from the use of umbrellas and other weather protection devices. The Vendor hereby agrees to indemnify, hold harmless, release, waive and forever discharge the City of Bloomington, Indiana, its employees, agents, and officers, and the members of the Farmers' Market Advisory Council, for all bodily and personal injuries, including injuries resulting in death, and property damage, claims, actions, damages, liabilities and expenses, including reasonable attorney fees and court costs, which may occur as a result of the Vendor's participation in the Market, whether or not sounding in tort or contract, and whether or not caused by a negligent act or omission of the City of Bloomington, its employees, agents, or officers or Farmers' Market Advisory Council.

[Filing No. 17-1 (Contract ¶¶ 8 & 10).]

The 2019 Market opened in April. [Filing No. 39-2, at ECF p. 11 (Handbook, section titled "Market Season Specifics").] In or around May, non-parties to this litigation, via their social media accounts, publicly alleged that Dye and Mackey were Nazis and/or white supremacists. [Filing No. 1, at ECF p. 3 (Compl. ¶ 17.] Thereafter, protesters began attending the Market and encouraging a boycott of Dye's and Mackey's business known as Schooner Creek Farm. [*Id*. at ECF p. 3 (Compl. ¶ 19).] On or about June 17, 2019, non-parties circulated a petition seeking the expulsion

of Schooner Creek Farm from the Market. [*Id*. at ECF p. 5 (Compl. ¶ 23).] The petition alleged that Schooner Creek Farm and Dye held a political position that created a hostile and unsafe atmosphere in the Market. [*Id*. at ECF p. 5 (Compl. ¶ 24).]

On or about June 27, 2019, the City published its "Clarification of Long-standing Rules of Behavior for the Bloomington Community Farmers' Market" ("Clarification"). [*Id*. at ECF p. 5 (Compl. ¶ 27).] The Clarification was consistent with terms of the Handbook incorporated by reference into the Contract. [*Id*. at ECF p. 3 & 6 (Compl. ¶¶ 16 & 30); Filing No. 39-2 at ECF p. 19 (Handbook, section titled "Information Alley") & ECF p. 23 (map).] The Clarification provided that signs and the distribution of literature by the public was permitted in designated areas around the Market boundaries but prohibited in the area where the farm vendors sold their product. [Filing No. 1, at ECF p. 5 (Compl. ¶ 28).] It further provided that: (1) interruption of commerce was prohibited; (2) interrupting commerce by yelling, screaming, or causing a scene was prohibited; (3) persons causing disruption in the farm vendor area would be asked by Market staff to relocate to an area designated for free speech; (4) non-compliance would cause Market staff to contact the Bloomington Police Department; and (5) further non-compliance could result in arrest. [*Id*. at ECF p. 5-6 (Compl. ¶ 29).] Notwithstanding publication of the Clarification, protests continued. [*Id*. at ECF p. 6-7 (Compl. ¶¶ 31, 37-39).]

In response to the continued protesting and the threat of violence the Bloomington Police Department asked Schooner Creek Farm to relocate its vending space from its prime, center-Market location to a space on the periphery of the Market. [*Id*. at ECF p. 6-8 (Compl. ¶¶ 31-34 & 44).] The City "coerced" Schooner Creek Farm to stop having a longtime stand assistant with suspected ties to a national white supremacist organization work at its booth because the stand assistant's presence made the protesters "uncomfortable"—although after a couple of weeks, the

5

City allowed the stand assistant to resume working at Schooner Creek Farm's booth. [*Id*. at ECF p. 8-9 (Compl. at ¶ 45).] The City also requested that Dye and Mackey attend a mediation at which the City asked them: (1) not to post political signage in their vending space; (2) not to advocate their political views in a manner suggesting that the Market endorsed their views; and (3) to limit their political speech at the Market to the areas designated for free speech, including but not limited to the area known as "Information Alley." [*Id*. at ECF p. 9 (Compl. at ¶¶ 46, 48 & 50).]

Dye and Mackey believe that the defendants had a duty to control the non-parties' conduct, did not do enough to stop the non-parties' protests, and even encouraged the protests. [*See generally*, *id*.] Dye and Mackey further believe that the defendants allowed the protests because the defendants agreed with the protesters' views and opposed Dye's and Mackey's views. [*See generally*, *id*.]

Dye and Mackey filed this lawsuit on February 14, 2020. [*Id*.] In sum, they allege that the defendants violated their state and federal constitutional rights by allowing the non-party protesters to engage in political speech in the vendor area of the Market, while prohibiting them from engaging in political speech in the vendor area of the Market, and selectively enforcing the Market's rules about the locations where political speech was allowed to occur in a way that favored the protesters and disfavored them. [*See generally*, *id*.]

Based on the above-quoted contractual provisions, the defendants filed a counter-claim against Dye and Mackey for the Plaintiffs breach of contract. [Filing No. 17, at ECF p. 28-31 (Answer and Countercls.)] That counter-claim is now at issue.[2]

---

[2] The defendants withdraw their counter-claim for indemnity.

**STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.").

Construction of a written contract is generally a question of law for which summary judgment is particularly appropriate. *Whiteco Industries, Inc. v. Nickolick*, 571 N.E.2d 1337, 1339 (Ind. Ct. App. 1991), trans. denied. A contract is not ambiguous merely because the parties offer different interpretations of contract terms. *Ind. Dep't. of Transportation v. Shelly & Sands, Inc.*, 756 N.E.2d 1063, 1099 (Ind. Ct. App. 2001). Ambiguity exists only when reasonable people reading the contract would arrive at different meanings of the terms. *Id*.

When considering a written contract, courts endeavor to ascertain the parties' intent by examining the language used by the parties in their agreement to express their obligations. *Buck v. Banks*, 668 N.E.2d 1259, 1261 (Ind. Ct. App. 1996). Words in a contract are given their plain, usual and ordinary meaning. *George Uzelac & Assoc. v. Guzik*, 663 N.E.2d 238, 240 (Ind. Ct. App. 1996), trans. denied. Specific words and phrases are not to be read exclusive of other contractual provisions. *Buck v. Banks*, 668 N.E.2d 1259, 1261 (Ind. Ct. App. 1996). The parties' intentions must be determined from the contract read in its entirety. *Id*.

Courts must also construe contractual provisions so as to harmonize all their provisions. *First Fed. Sav. Bank v. Key Markets, Inc*., 559 N.E.2d 600, 603 (Ind. 1990). Where a contract's

terms are clear and unambiguous, the terms are conclusive. *Id*. at 906. The court's power to interpret contracts does not extend to changing the contract's terms. *Gregg v. Cooper*, 812 N.E.2d 210, 215 (Ind. Ct. App. 2004).

## DISCUSSION

Plaintiffs agreed that they would "not institute *any* action or suit at law or in equity against the City or the City's agents or employees as a result of operations under this Agreement." [Filing No. 17-1, at ECF p. 4 (Contract ¶ 8) (emphasis added).] They also agreed to hold harmless, release waive and forever discharge the defendants from *all* claims, actions, damages, liabilities, and expenses which may occur as a result of their participation in the Market. [*Id*. (Contract ¶ 10) (emphasis added).] By bringing this action, they have breached both paragraphs 8 and 10 of the Contract.

Contract provisions such as those at issue in this case are assessed by first asking whether the contract language bars and releases the plaintiff's claims. If so, the contract's validity as a matter of public policy is then assessed under state contract law and federal law. This was the path followed in *Pierce v. Atchison, Topeka & Santa Fe Ry. Co.*, 65 F.3d 562 (7th Cir. 1995).

### A. The Contract's language bars and releases the Plaintiffs' claims.

Per paragraph 8 of the contract, Plaintiffs agreed not to institute "any" actions or suits against the defendants, and per paragraph 10, they agreed to hold harmless, release, waive and forever discharge the defendants from "all" personal injuries, claims, actions, damages, liabilities and expenses. Merely because the words "any" and "all" are extremely broad, does not make paragraphs 8 and 10 ambiguous. *Pierce*, 65 F.3d at 568. The Seventh Circuit Court of Appeals has held that a release which uses the term "any and all", while "extremely broad", is "not ambiguous" and "clearly" sufficient to encompass federal intentional age and race discrimination

claims. *Id*. The plain and unambiguous language of the Contract evinces the parties' intent to bar any lawsuits and all claims.

To avoid their agreement, Plaintiffs argue that this lawsuit and their claims in this action are not barred because they do not arise "as a result of operations under this Agreement." They point to paragraph 8 of the Contract and urge the Court to find that the phrase "as a result of operations under this Agreement" means only that vendors cannot bring a lawsuit relating to the subjects addressed in the Handbook, such as disputes over the vendor point system relating to booth selection, what kinds of farm product can be sold, the hours that a farm vendor may be on the premises, and where farm vendors may park their trailers. They assert that their claims in this action have nothing to do with the subjects addressed in the Handbook. They are incorrect.

Plaintiffs read the Contract too narrowly and urge an unreasonable interpretation. By asserting that paragraph 8 of the Contract must be construed only with reference to the Handbook, Plaintiffs would have the Court overlook the Contract as a whole. The Contract's first unnumbered paragraph relating to the consideration given, paragraph 8's prohibition against instituting any action or suit in law or in equity, and paragraph 10's hold harmless, release, waiver, and discharge provisions, establish the parties' clear and unambiguous intent: For the privilege of participating in the 2019 Market, Plaintiffs agreed not to file suit against, and waive and release the defendants from all claims relating to the Market's operation and their participation in the Market—period.

Plaintiffs' speech claims asserted in Counts I, II, IV, V, and VII of their complaint take issue with: (1) the City's right to impose reasonable time, place, and manner restrictions on political speech in the farm vendor area of the Market; (2) designate specific areas where issues can be openly discussed and explored without disrupting the other activities in the Market; and (3) their perception that the City allowed the protesters to violate the Market rules, while requiring

9

them to comply with those rules. These claims very clearly relate to the Market's operation and Plaintiffs' participation therein.

Notably, Plaintiffs concede that "vendors may not sue the City for an issue arising from the operational rules." [Filing No. 39, at ECF p. 12 (Br. in Supp. Mot for Partial Summ. J.).] Their concession is significant because, even under their view of the Contract, all of their speech claims arise from the "operational rules" which they contend are found in the Handbook. Indeed, pages 17 and 21 of Handbook address "Information Alley", the area designed for open communication so to avoid disrupting other activities at the Market. [Filing No. 17-1, at ECF p. 3 (Contract ¶ 6(d)); Filing No. 39-2, at ECF p. 19 (Handbook, section titled "Information Alley").]

Plaintiffs are incorrect when they assert that the Handbook's provisions relating to "Information Alley" do not apply to them. Paragraph 3 of the Contract states that the "2019 Farm Vendor Handbook is incorporated herein by reference and is a part of this contract as if it had been set forth herein." [Filing No. 17-1, at ECF p. 2 (Contract ¶ 3).] Moreover, the Handbook's provisions relating to "Information Alley" apply to "community groups, organizations, businesses, and individuals." [Filing No. 39-2, at ECF p. 19 (Handbook, section titled "Information Alley".] Dye and Mackey are individuals, and Schooner Creek Farm is their business. [Filing No. 1, at ECF p. 2-3 (Compl. ¶¶ 1-3).] The notion that the Handbook's section on "Information Alley" does not apply to Dye, Mackey, or Schooner Creek Farm because they are vendors and cannot also be individuals or a business is unsupported by any reasonable interpretation of the Contract or the Handbook.

Plaintiffs' association claim asserted in Count III of their complaint takes issue with the City's alleged interference with their choice of stand assistants. That claim also arises "as a result of operations under this Agreement" and "as a result of [their] participation in the Market." Indeed,

paragraph 2 of the Contract references stand assistants, and Plaintiffs' participation in the Market is what generated the controversy surrounding their stand assistant. [Filing No. 17-1, at ECF p. 2 (Contract ¶ 2); Filing No. 1, at ECF p. 20 (Compl. ¶¶ 70-71).]

Likewise, Plaintiffs' deprivation of chosen booth space claim asserted in Count VI of their complaint arises "as a result of operations under this Agreement" and "as a result of [their] participation in the Market." Paragraph 1 of the Contract reserves for the Market Manager and Master the right to assign vending space, and Part III of the Handbook addresses the vendor point system, a system pursuant to which vendors can select their booth space based on a seniority system. [Filing No. 17-1, at ECF p. 2 (Contract ¶ 1); Filing No. 39-2, at ECF p. 10 (Handbook, section titled "Vendor Point System").] The Handbook also makes clear that a vendor's selection of booth space is not absolute as the City expressly reserved the right to require vendors to adjust their setup if determined to be unsafe by Market staff. [Filing No. 39-2, at ECF p. 18 (Handbook, section titled "Equipment and Supplies").]

Given the Contract's unambiguous language, the provisions of the Handbook, and the facts, there can be no reasonable question that the Contract's language bars this action and the Plaintiffs' claims. The question then becomes whether the Contract is valid and can be enforced. *Pierce.*, 65 F.3d 562.

B.     **The Contract is valid and enforceable under Indiana law.**

Indiana recognizes the validity of prospective releases of liability, also known as exculpatory agreements. The familiar and typical situation is the execution of a release as part of a contract to engage in a recreational activity. *See*, *e.g.*, *Wabash County Young Men's Christian Ass'n, Inc. v. Thompson*, 975 N.E.2d 362 (Ind. Ct. App. 2012), *trans. denied* (release signed as condition of playing in softball league); *City of Hammond v. Plys*, 893 N.E.2d 1 (Ind. Ct. App.

2008) (release signed by member of city fitness center as condition of membership); *U.S. Auto Club, Inc. v. Smith*, 717 N.E.2d 919 (Ind. Ct. App. 1999), *trans. denied* (release signed by race-car sponsor as condition of entering pit area). It is "well-settled in Indiana that such 'exculpatory' agreements are not against public policy." *Id.* at 922.

This Court has described Indiana law with respect to such release agreements:

> Under Indiana law, a release agreement is a contract by which a party's right to prosecute a cause of action against the other party to the contract is surrendered. Enforcing release agreements serves a vital public policy by facilitating the orderly settlement of disputes. As is true with other contracts, the interpretation of a release is [determined] by its terms, considered in light of all of the facts and circumstances. However, in the absence of some ambiguity within the terms of the release, our analysis is limited to the four corners of the release agreement in determining the intentions of the parties.

*Midwest Lumber & Dimension, Inc. v. Branch Banking & Trust Co.*, 2007 WL 2757270, *7 (S.D. Ind. Sept. 20, 2007) (citations omitted).

As noted above, merely because the Contract's language is extremely broad, does not make it ambiguous. *See Pierce*, 65 F.3d at 568. Importantly, there was sufficient consideration for the release—i.e., the opportunity to participate in the 2019 Market. And Dye and Mackey both signed the Contract. Whether they did so or not, they had the opportunity to consult with an attorney before signing it, and they cannot claim not to have read it because, under Indiana law, persons are presumed to understand the documents they sign and cannot be released from the terms of a contract based on the failure to have read it. *Fultz v. Cox*, 574 N.E.2d 956, 958 (Ind. Ct. App. 1991).

### C. The Contract is valid and enforceable under federal law.

Constitutional claims, like other claims, can be waived by way of a contract. *U.S. v. Barnett*, 415 F.3d 690, 691 (7th Cir. 2005). Plaintiffs recognize that fact but argue that

constitutional claims are so paramount in their importance that they cannot be waived by way of a contract unless the contract expressly states that constitutional claims are waived. That, however, is not the case. Waivers of federal rights need only be "knowing and voluntary." *Domka v. Portage Co. Wis*, 523 F.3d 776, 781 (7th Cir. 2008).

Plaintiffs cannot reasonably claim to have not knowingly and voluntarily waived the right to bring this action including their federal constitutional claims. They agreed not to institute *any* action or suit against the defendants and also agreed to hold harmless, release, waive and forever discharge the defendants from *all* claims, actions, damages, liabilities and expenses occurring as a result of their participation in the Market. The notion that federal constitutional claims were somehow exempted from the parties' agreement because they were not expressly mentioned is inconsistent with the plain language of the Contract.

While Plaintiffs cite *Kilburn-Winnie* in support of their argument that they could not have knowingly and voluntarily waived their claims in this action, *Kilburn-Winne* actually supports the opposite. *Kilburn-Winne* involved the broad release of "all claims" without any exception for any particular claims, such as claims raised without constitutional standing. *Kilburn-Winne v. Town of Fortville*, No. 1:15-cv-01784-RLY-DKL, 2016 WL 4088636, at *6 (S.D. Ind. Aug. 2, 2016). In that case, the Court noted that persons are assumed to have read and understood the documents they sign. *Kilburn-Winne v. Town of Fortville*, No. 1:15-cv-01784-RLY-DKL, 2016 WL 4088636, at *6 (S.D. Ind. Aug. 2, 2016). It found that plaintiff Allen-Gregory had signed the release at issue, was presumed to have read it, and the release was, therefore, enforceable against her. Like Allen-Gregory, Dye and Mackey signed the Contract at issue in this case. Dye and Mackey are therefore presumed to have read the Contract, to have understood that if they signed it, they were agreeing not to sue the defendants and were waiving all claims against the defendants arising out of the

Market's operation and their participation therein, and to have knowingly and voluntarily waived their claims in this action. The reason that plaintiff Kilburn-Winne's constitutional claims were allowed to go forward was because there was no evidence that she had signed the release language at issue. That is not the case with Dye and Mackey here.

Dye and Mackey also claim that their case is like *Dixon v. Nat'l Hot Rod Ass'n*, 450 F. Supp. 3d 831 (S.D. Ind. 2020). The Dixon case, however, involved willful and wanton conduct. As a matter of public policy, a party cannot limit its liability for willful and wanton conduct through a release. *Id.* at 843. By contrast, public policy does not preclude the waiver of constitutional claims. *Domka*, 523 F.3d at 781.

## CONCLUSION

By initiating this lawsuit and continuing its prosecution, Plaintiffs have breached both paragraphs 8 and 10 of the Contract. Their motion for summary judgment on the breach of contract counter-claim must be denied.

Respectfully submitted,

STEPHENSON MOROW & SEMLER

 /s/ *Pamela G. Schneeman*
Pamela G. Schneeman
Attorney No. 18142-53
Attorney for Defendants,
City of Bloomington, Mayor John Hamilton
Paula McDevitt and Marcia Veldman

STEPHENSON MOROW & SEMLER
3077 East 98th Street, Suite 240
Indianapolis, IN 46280
Telephone: (317) 844-3830
Fax: (317) 573-4194
Email: pschneeman@stephlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2020, a copy of the foregoing DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's CM/ECF system.

**Michael Jay Bruzzese**
ORZESKE & BLACKWELL, P.C
50 East 91st Street
Suite 104
Indianapolis, IN 46240
Email: Mbruzzese@indylitigation.com

**Jacob Alexander Catt**
ORZESKE & BLACKWELL, P.C
50 East 91st Street
Suite 104
Indianapolis, IN 46240
Email: jcatt@indylitigation.com

    s/*Pamela G. Schneeman*
    Pamela G. Schneeman

STEPHENSON MOROW & SEMLER
3077 East 98th Street, Suite 240
Indianapolis, IN 46280
Phone: 317-844-3830
Fax: 317-573-4194
Email: pschneeman@stephlaw.com