UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SARAH DYE, | ) | |
| DOUGLAS MACKEY, and | ) | |
| SCHOONER CREEK FARM, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-00518-RLY-DML |
| | ) | |
| CITY OF BLOOMINGTON, INDIANA, | ) | |
| MARCIA VELDMAN, | ) | |
| PAULA MCDEVITT, and | ) | |
| JOHN HAMILTON, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| PAULA MCDEVITT, | ) | |
| CITY OF BLOOMINGTON, INDIANA, | ) | |
| JOHN HAMILTON, and | ) | |
| MARCIA VELDMAN, | ) | |
| | ) | |
| Counterclaimants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SARAH DYE and | ) | |
| DOUGLAS MACKEY, | ) | |
| | ) | |
| Counterclaim | ) | |
| Defendants. | ) | |

**ENTRY ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
AND DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs, Sarah Dye and Douglas Mackey, are small-scale farmers who sell their

produce at the Bloomington, Indiana city-run farmers' market.  Non-parties to this

litigation have also accused them of being Nazis and/or white supremacists.  After these

1

allegations became public in 2019, individuals and organizations began protesting Plaintiffs' presence at the Bloomington Farmers' Market and urging market patrons to boycott Plaintiffs' business, Schooner Creek Farm.  Plaintiffs believe Defendants, the City of Bloomington, Mayor John Hamilton, Paula McDevitt, Administrator of the Bloomington Parks and Recreation Department, and Marcia Veldman, Program Coordinator for the Bloomington Farmers' Market, violated their constitutional rights by selectively enforcing regulations pertaining to expressive conduct at the Market. Defendants counterclaimed, alleging that by filing suit in the first instance, Plaintiffs breached their contract, which contained Covenant Not to Sue and Liability and Indemnification provisions.

Now pending before the court are Plaintiffs' Motion for Partial Summary Judgment on Defendants' counterclaim, Motion to Strike a sentence contained in Defendants' Response brief, and Motion for Oral Argument.  For the reasons stated below, those motions are **DENIED**.

## I.     Factual Background

Sarah Dye and Douglas Mackey operate Schooner Creek Farm, which has sold produce at the Bloomington Farmers' Market for the past decade.[1]  (Filing No. 1-1, Compl. ¶¶ 2-3, 14).  Vendors wishing to sell their products at the Bloomington Farmers' Market are required to go through an application and selection process and submit a

---

[1] Defendants accept the facts alleged in Plaintiffs' Complaint as true for purposes of responding to Plaintiffs' motion, but neither party submitted any evidence regarding the factual background of this case.  The only evidence relied upon by the parties is the Vendor Contract, (Filing No. 39-1), and the Farm Vendor Handbook, (Filing No. 39-2).

complete Farm Vendor Application and Contract, which incorporates the Farm Vendor

Handbook.  (Filing No. 39-1, Contract ¶ 3; Filing No. 39-2, Handbook at 3 (collectively

"Vendor Contract")).

Two provisions of the Contract are at issue:

> **8. COVENANT NOT TO SUE**
> The Vendor will not institute any action or suit at law or in equity against the City or the City's agents or employees as a result of operations under this Agreement. The Vendor will not aid in the institution or prosecution of any claim for damages, costs, loss of services, expenses or compensation for or on account of any damages, loss or injury to person or property as a result of operation under this Agreement.
>
> . . .
>
> **10. LIABILITY AND INDEMNIFICATION**
> The Vendor is solely responsible for damages from the sale of unsafe and unsound goods. The Vendor is solely responsible for damages or personal injury resulting from the use of umbrellas and other weather protection devices. The Vendor hereby agrees to indemnify, hold harmless, release, waive and forever discharge the City of Bloomington, Indiana, its employees, agents, and officers, and the members of the Farmers' Market Advisory Council, for all bodily and personal injuries, including injuries resulting in death, and property damage, claims, actions, damages, liabilities and expenses, including reasonable attorney fees and court costs, which may occur as a result of the Vendor's participation in the Market, whether or not sounding in tort or contract, and whether or not caused by a negligent act or omission of the City of Bloomington, its employees, agents, or officers or Farmers' Market Advisory Council.

(Contract ¶¶ 8, 10).  Plaintiffs' motion and Defendants' counterclaim concern the scope

and enforceability of these provisions.  Accordingly, while the merits of Plaintiffs' claims

are not at issue, it is necessary to preview those claims and the factual allegations from which the claims arise.

Sometime in May 2019, non-parties publicly alleged that the owners of Schooner Creek Farm were Nazis and/or white supremacists.  (Compl. ¶ 17).  These allegations circulated online, and Dye and Mackey were "doxed"[2] on June 1, 2019.  (*Id.* ¶ 18).  After Dye and Mackey's identities were revealed, individuals began protesting Schooner Creek Farm's participation in the Market.  (*Id.* ¶ 19).  These protestors positioned themselves near the Schooner Creek Farm booth in the Market, and they urged others at the Market to boycott Schooner Creek Farm.  (*Id.*).  On June 17, 2019, a public petition was submitted to the Market through the Farmers' Market Advisory Counsel.  (*Id.* ¶ 23).  The petition alleged that Schooner Creek Farm and Dye held political beliefs that created a hostile and unsafe environment, and the petition sought the expulsion of Schooner Creek Farm from the Market.  (*Id.* ¶¶ 23–24).

On June 27, 2019, the City published a "Clarification of Long-Standing Rules of Behavior for the Bloomington Community Farmers' Market."  (*Id.* ¶ 27).  The Clarification provided: (1) interruption of commerce was prohibited; (2) interruption of the market by yelling or causing a scene was not permitted; (3) Market staff will ask anyone causing a disruption to move to the area designated for free speech; (4) non-compliance would lead to Market staff contacting the Bloomington Police Department;

---

[2] "Doxing" refers to publicly identifying someone or publishing private information about someone as a form of punishment or revenge.  *See* www.merriam-webster.com/dictionary/dox (last visited Nov. 19, 2021).

and (5) Bloomington police officers will reiterate the request to move, and further non-compliance could lead to arrest. (*Id.* ¶ 29). Consistent with the Farm Vendor Handbook, the Clarification also specified that expressive activity may only occur in a designated area known as "Information Alley." (*Id.* ¶ 30; Handbook at 17). Those seeking a spot in Information Alley were required to pay a $10 application fee, as well as a $10 daily space fee. (Compl. ¶ 30). Signs, distributing literature, and other expressive activity remained prohibited in the vendor area. (Compl. ¶ 28). Despite these directives, protests continued. (*Id.* ¶¶ 31, 37–39).

On July 31, 2019, Mayor Hamilton announced the Market would be closed for two weeks. (*Id.* ¶ 32). During that shutdown period, a group called No Space for Hate formed in response to Schooner Creek's presence at the Market. (*Id.* ¶ 33). The group began posting articles and reports on its website and Facebook page calling for boycotts of Schooner Creek, publishing photos of Dye, and implying Schooner Creek was connected to white supremacist violence in other parts of the country. (*Id.*).

The Market reopened on August 17, 2019, and protestors again turned out to encourage a boycott of Schooner Creek Farm. (*Id.* ¶ 37). According to Plaintiffs, No Space for Hate was given an area to set up a tent to distribute information, but Defendants waived the fees required to obtain the spot. (*Id.* ¶ 36). Protestors wearing purple shirts with the phrase "Boycott Schooner Creek – Defund White Supremacy" printed on the back marched or stood in front of the Schooner Creek vending space. (*Id.* ¶ 38). This group of protestors, referred to as "The Purple Shirt Brigade" by local media outlets, allegedly formed a physical barrier preventing Market patrons from accessing

Schooner Creek's booth. (*Id.* ¶¶ 38–39). The City responded by having the Bloomington Police Department ask Schooner Creek to relocate its vending stand from the center of the Market to a space on the periphery. (*Id.* ¶ 44). The City also "coerc[ed]" Schooner Creek into no longer allowing a stand assistant[3] to work at the Market because his presence made the protestors "uncomfortable." (*Id.* ¶ 45).

On September 12, 2019, the City requested Dye and Mackey attend a mediation with City officials. (*Id.* ¶ 46). The City asked that Dye and Mackey (1) refrain from posting political signs in its vending space; (2) refrain from advocating for any political position in a manner suggesting the Market endorsed their views; and (3) limit their expressive activity to areas designated for such activity. (*Id.* ¶¶ 46, 48, 50). Plaintiffs claim they have complied with these requests. (*Id.* ¶¶ 46, 48, 50). But Plaintiffs also claim that the City selectively enforced its own restrictions by allowing the protestors to display signs and conduct other expressive activity within the vending area, and that the City has expressed its support for the protestors' message. (*Id.* ¶¶ 47, 49, 51).

## II.    Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Hackett v. City of S. Bend*, 956 F.3d 504, 507 (7th Cir. 2020) (quoting Fed R. Civ. P. 56(a)). "Generally, the construction of a written contract is a question of law for which summary judgment is particularly appropriate." *Arrotin Plastic Materials of*

---

[3] A stand assistant is defined in the Contract as someone who assists the vendor at the market, but who must be accompanied by a vendor at all times while at the market. (Contract at 1).

*Indiana v. Wilmington Paper Corp.*, 865 N.E.2d 1039, 1041 (Ind. Ct. App. 2007).  "The goal of contract interpretation is to determine the intent of the parties when they made the agreement."  *Celadon Trucking Servs., Inc. v. Wilmoth*, 70 N.E.3d 833, 839 (Ind. Ct. App. 2017).  This requires the court to examine "the plain language of the contract, read it in context and, whenever possible, construe it so as to render every word, phrase, and term meaningful, unambiguous, and harmonious with the whole."  *Id.*

## III.    Discussion

Defendants claim Plaintiffs breached the Vendor Contract by filing suit.  Specifically, Defendants argue the Covenant Not to Sue and Liability and Indemnification provisions both bar Plaintiffs' claims.  Plaintiffs' motion presents two issues: (1) whether the Covenant Not to Sue and Liability and Indemnification provisions apply to Plaintiffs' claims, and (2) if so, whether those provisions are enforceable.  On the first issue, the court concludes that Plaintiffs' claims fall within the Covenant Not to Sue, but the Liability and Indemnification provision does not apply to claims brought by a vendor against Defendants.  On the second issue, the court cannot determine whether the Covenant Not to Sue is enforceable because, based on the record presented, there is insufficient evidence that Plaintiffs knowingly and voluntarily waived their constitutional claims.

### A.    Whether the Provisions Apply to Plaintiffs' Claims

When Dye and Mackey signed the Contract, they agreed that they "will not institute any action or suit at law or in equity against the City or City's agents or employees *as a result of operations under this Agreement*."  (Contract ¶ 8) (emphasis

7

added).  "Operations" is not a defined term in the Vendor Contract, so the court must read the phrase in the context of the entire document.  *See Celadon*, 70 N.E.3d at 839 (requiring courts to examine the plain language of the contract and read it context).

Plaintiffs argue that their constitutional claims do not arise "as a result of operations under this Agreement."  According to Plaintiffs, the intent of the parties was that this phrase only applies to claims arising from the "operational rules" of the Market, such as what types of goods may be sold, the dates and times of the Market's operation, how the vendor point system works, and how vendors can reserve and set up their vending spaces.  (*See* Filing No. 39, Pl.'s Br. in Supp. of Summ. J. at 12; *see generally* Vendor Contract).  Because their claims do not arise from any of these subjects—they arise from the United States and Indiana constitutions—Plaintiffs contend the Covenant Not to Sue does not apply to their claims.

Plaintiffs' interpretation of the Covenant Not to Sue is unreasonably narrow and fails to appropriately read the provision in the broader context of the Vendor Contract. While Plaintiffs are, of course, correct that the United States and Indiana constitutions provide the legal cause of action for Defendants to assert their claims in court, that does not mean that their claims, as a factual matter, did not arise from the operations of the Vendor Contract.

First, and most simply, "operations" is a broad term encompassing the Market's rules, as well as Plaintiffs' participation and activity in the Market, which are permitted by virtue of signing the Vendor Contract.  Indeed, it is only due to their participation in the Market that these claims arise.

Further, while Plaintiffs insist that the Covenant Not to Sue applies only to the Market's operational rules, they fail to adequately explain why their claims do not fall within those rules.  For example, the Handbook and Market Rules of Behavior plainly contemplate issues related to freedom of speech.  The section of the Handbook titled "Information Alley" explains that the City "is committed to providing an environment where issues and ideas are openly discussed and explored."  (Handbook at 17).  It further explains that "[i]n order to provide an atmosphere in which open communication can occur without disrupting the other activities at the Market, community groups, businesses and individuals interested in sharing information may do so in a designated area . . . following specific guidelines . . . ."  (*Id.*).  Those interested in participating must pay a $10 application fee and a $10 daily space fee.[4]  (*Id.*).  The City also published the "Clarification of Long-standing Rules of Behavior for the Bloomington Community Farmers' Market," which, consistent with the Handbook, specified that the distribution of literature is permitted in designated areas outside the vending area but prohibited within the vending area, and that expressive activity may only occur in Information Alley. (Compl. ¶¶ 28–30).

Plaintiffs' free speech, equal protection, and due process claims address precisely these topics.  Plaintiffs challenge Defendants' decision to: (1) prohibit Plaintiffs' political speech in the Market while endorsing that of the protestors; (2) waive the rental fees for

---

[4] Plaintiffs suggest that the Information Alley provision does not apply to them because while Vendor is a defined term in the Contract, (Contract ¶ 2), the Information Alley provision refers only to "community groups, organizations, businesses and individuals," (Handbook at 17).  This argument is incorrect, as Dye and Mackey are individuals, and Schooner Creek is a business.

No Space for Hate while requiring Plaintiffs to pay a rental fee if they were to rent a space in Information Alley; (3) prohibit Plaintiffs from displaying political signs and engaging in political discourse in the Market; (4) "not enforce the same time, place, and manner restriction" against the protestors; and (5) censor speech based on vague standards and arbitrarily determine what is and is not prohibited speech.  (*Id.* ¶¶ 56, 58–59, 65–66, 77, 82–83 98–100).  Each of these allegations is covered by the Handbook and Rules of Behavior.  Even under Plaintiffs' interpretation of the Vendor Contract—that "vendors may not sue the City for an issue arising from the operational rules"—these claims arise from the operational rules pertaining to where and how expressive activity may occur at the market.  (Pl.'s Br. in Supp. of Summ. J. at 12).  Indeed, Plaintiffs concede as much by referring to Defendants' "regulations" and "standards" relating to time, place, and manner restrictions on speech, (Compl. ¶¶ 59, 75, 82); the Handbook and Rules of Behavior outline these regulations.

The same is true for Plaintiffs' freedom of association claim—which arises from Defendants allegedly coercing Plaintiffs to terminate their relationship with a stand assistant.  (Compl. ¶¶ 68–73).  The Contract refers to stand assistants, describes their role, and explains that only Vendors and Stand Assistants may sell at the Market.  (*See* Contract ¶ 2).  Defendants' authority to control who may or may not be involved in selling products at the Market falls within the Vendor Contract's terms, and Plaintiffs' choice to use this particular stand assistant is the basis of the freedom of association claim.

Finally, Plaintiffs' deprivation of property claim, which arises from the Defendants requesting Plaintiffs relocate to a less desirable location on the periphery of the Market, arises from the Market's operations and Vendor Contract. (Compl. ¶¶ 88–96). Plaintiffs even acknowledge that "[t]he vending space is let to [Plaintiffs] pursuant to the [Vendor Contract]." (*Id.* ¶ 90). The Handbook describes the seniority system for selecting a vending space, and it specifies that the City reserves the right to adjust a vendor's setup if determined to be unsafe by Market staff. (*See* Handbook at 8 (describing vendor point system); *id* at 16 (describing City's right to adjust vendor space if deemed unsafe)). Simply put, Plaintiffs' deprivation of property claim expressly relies upon the Vendor Contract and the operational rules related to selecting a vending space set forth therein.

In sum, the natural reading of the Covenant Not to Sue leads the court to conclude that Plaintiffs' claims "arise as a result of operations under this Agreement."

As for the Liability and Indemnification provision, Plaintiffs agreed to "hold harmless, release, waive and forever discharge" Defendants "for all bodily and personal injuries . . . , claims[,] actions, damages, [and] liabilities . . . which may occur as a result of the Vendor's participation in the Market, whether or not sounding in tort or contract . . . ." (Contract ¶ 10). The court agrees with Plaintiffs that this provision applies only to third-party claims and is therefore inapplicable to a suit between a vendor and Defendants.

The title of the provision, when read with the provision's text, refers to who bears liability in a suit brought by a third party and the vendor's agreement to indemnify Defendants in a suit brought by a third party against Defendants. Looking at the text

11

itself, the first two sentences of the paragraph plainly refer to claims by a third party: "The Vendor is solely responsible for damages resulting from the sale of unsafe or unsound goods.  The Vendor is solely responsible for damages or personal injury resulting from the use of umbrellas and other protection devices." (*Id.*).

The third sentence continues by explaining that the vendor agrees to "indemnify, hold harmless, release, waive and forever discharge [Defendants] for all bodily and personal injuries, including injuries resulting in death, and property damage, claims[,] actions, damages, liabilities and expenses, including reasonable attorney fees and court costs, which may occur as a result of the Vendor's participation in the Market, whether or not sounding in tort or contract, and whether or not caused by a negligent act or omission" by Defendants.  (*Id.*).  In other words, if a third party sues the vendor, the vendor agrees that it will not attempt to add Defendants as third-party defendants in the action.  Should a third party sue Defendants for something involving the vendor, the vendor also agrees to indemnify Defendants.  For example, if a vendor injures a customer while navigating a vehicle through the Market area, the plain understanding of this provision is that the vendor assumes all liability for claims brought by third parties and will not attempt to shift liability to Defendants, even if the accident was caused by a negligent act or omission of Defendants.  Accordingly, because this provision does not apply to Plaintiffs' claims against the City, Plaintiffs did not breach this provision of the Vendor Contract by filing suit.

**B.      Whether the Covenant Not to Sue is Enforceable**

Having concluded that Plaintiffs' constitutional claims "arise as a result of operations under this Agreement," the court must now consider whether the Covenant Not to Sue is enforceable.  Plaintiffs argue the Covenant Not to Sue lacks the specificity required for a valid waiver of constitutional rights.  *See Dixon v. Nat'l Hot Rod Ass'n*, 450 F. Supp. 3d 831, 843 (S.D. Ind. 2020) (concluding covenant not to sue lacked sufficient "specificity" as to what claims were covered by waiver and thus "contain[ed] no clear statement that would give [Plaintiffs] notice of the harsh burden" that a complete release imposed (quoting *Exide Corp. v. Millwright Riggers, Inc.*, 727 N.E.2d 473, 480 (Ind. Ct. App. 2000), *trans. denied*, 727 N.E.2d 473)).  Based on the record presented, the court cannot determine whether the waiver is valid.

For a waiver of constitutional rights to be valid, it must be made intelligently, knowingly, and voluntarily.  *See, e.g.*, *Domka v. Portage Cty.*, 523 F.3d 776, 781 (7th Cir. 2008) (collecting cases); *see also Fuentes v. Shevin*, 407 U.S. 67, 95 (1972) (a waiver "must, at the very least, be clear"); *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 145 (1967) (waiver of First Amendment rights must be shown by clear and compelling evidence).  Whether an individual's waiver was intelligent, knowing, and voluntary depends "upon the particular facts and circumstances surrounding that case, including the background, experience and conduct" of the waiving party.  *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *see also Democratic Nat. Comm. v. Republican Nat. Comm.*, 673 F.3d 192, 205 (3d Cir. 2012) (same in First Amendment context).  Courts "do not presume acquiescence in the loss of fundamental rights.  Indeed, in the civil no less than the

13

criminal area, courts indulge every reasonable presumption against waiver."[5]  *Bayo v. Napolitano*, 593 F.3d 495, 503 (7th Cir. 2010) (quoting *Fuentes*, 407 U.S. at 94 n.31).

In *Fuentes*, the Supreme Court found that the appellants had not waived their due process rights because "the purported waiver provision was a printed part of a form sales contract and a necessary condition of sale."  407 U.S. at 95.  Moreover, there was "no bargaining over contractual terms between the parties," and there was no evidence that the appellants "were actually aware or made aware of the significance of the fine print now relied upon as a waiver of constitutional rights."  *Id.*  By contrast, the Court in *D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174 (1972), upheld a contractual waiver of due process rights where the contract had been negotiated between two corporations; the waiver provision had been specifically bargained for and drafted by the lawyers as part of the negotiations; the case did not involve unequal bargaining power; and both parties were "aware of the significance" of the waiver provision.  *Id.* at 186.

Given the procedural posture of this case—Plaintiffs moved for summary judgment, but neither party submitted evidence beyond the Contract and Handbook—the court is unable to determine whether the Covenant Not to Sue amounts to a valid waiver of constitutional claims.  The purported waiver provision is contained in what appears to be a form contract that all vendors wishing to sell products at the Market must sign, but

---

[5] It is also important to note that "[t]he question of waiver of a federally guaranteed constitutional right is, of course, a federal question controlled by federal law."  *Brookhart v. Janis*, 384 U.S. 1, 4 (1966).  So, it is no answer to say that as a matter of Indiana law, persons are "presumed to understand the documents which [they] sign[] and cannot be relieved from the terms of a contract due to their failure to read it[.]"  *Fultz v. Cox*, 574 N.E.2d 956, 958 (Ind. Ct. App. 1991) (citations omitted).

there is no evidence that the parties bargained for this particular provision to be included, and, critically, there is no evidence that Plaintiffs, small-scale farmers, were made aware that they surrendered their constitutional rights by participating in the Market. Accordingly, given the lack of evidence on this issue, the court cannot determine whether Plaintiffs knowingly, voluntarily, and intelligently waived their constitutional claims when they signed the Vendor Contract and Covenant Not to Sue.

## IV.     Objection and Motion to Strike

Plaintiffs also filed a motion to strike a sentence in Defendants' Response brief: "After non-parties to this litigation discovered Dye's and Mackey's white supremacist views, they went to the Market to protest . . . ."  Plaintiffs claim that while Defendants correctly state elsewhere that there had been allegations that Dye and Mackey held such views, this particular phrase asserts that these allegations are true.  As such, it assumes facts not in evidence and is libelous.

This phrase appears in the second sentence of Defendants' introduction.  When read as part of the entire document, it is properly understood as argument.  Accordingly, the motion to strike is denied.

**V.      Conclusion**

For the foregoing reasons, Plaintiffs' Motion for Partial Summary Judgment

(Filing No. 38) is **DENIED**.  Plaintiffs' Motion for Oral Argument (Filing No. 44) is

**DENIED as MOOT**.  Plaintiffs' Motion to Strike (Filing No. 45) is **DENIED**.

**SO ORDERED** this 19th day of January, 2022.


RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsel of Record.

16