UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SARAH DYE, | ) | |
| DOUGLAS MACKEY, and | ) | |
| SCHOONER CREEK FARM, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-00518-RLY-DML |
| | ) | |
| CITY OF BLOOMINGTON, INDIANA, | ) | |
| MARCIA VELDMAN, | ) | |
| PAULA MCDEVITT, and | ) | |
| JOHN HAMILTON, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| PAULA MCDEVITT, | ) | |
| CITY OF BLOOMINGTON, INDIANA, | ) | |
| JOHN HAMILTON, and | ) | |
| MARCIA VELDMAN, | ) | |
| | ) | |
| Counterclaimants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SARAH DYE and | ) | |
| DOUGLAS MACKEY, | ) | |
| | ) | |
| Counterclaim | ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Sarah Dye and Douglas Mackey operate Schooner Creek Farms and sell

produce at the Bloomington, Indiana city-run farmers' market.  Non-parties to this

litigation have accused Dye and Mackey of being Nazis and/or white supremacists.

1

Protestors began appearing at the Bloomington Farmers' Market to protest Plaintiffs'
presence at the Market and to encourage market patrons to boycott Schooner Creek.
Tensions grew over the course of the summer of 2019, ultimately leading to the present
suit against Defendants, the City of Bloomington; Mayor John Hamilton; Paula
McDevitt, Administrator of the Bloomington Parks and Recreation Department; and
Marcia Veldman, Program Coordinator for the Bloomington Farmers' Market
(collectively, the "Defendants" or the "City").  Plaintiffs believe Defendants violated their
constitutional rights by failing to intervene and stop the protests, selectively enforcing
Market rules regarding expressive conduct, and encouraging the boycott.

Now pending before the court are Defendants' Motion for Summary Judgment and
Plaintiffs' Motion for Oral Argument.  For the reasons that follow, Defendants' motion is
**GRANTED**.  Plaintiffs' motion for oral argument is **DENIED as MOOT**.

## I.    Factual Background

The facts relevant to this motion are as follows, and the court views those facts in
the light most favorable to Plaintiffs as the non-moving party.  *Swetlik v. Crawford*, 738
F.3d 818, 821 (7th Cir. 2013).

Vendors wishing to sell their products at the Bloomington Farmers' Market were
required to sign the Farm Vendor Contract.  (Filing No. 60-10, Paula McDevitt Decl., Ex.
E ¶ 3 ("Contract"); *Id.*, Ex. A at 3 ("Handbook") (collectively, "Vendor Contract")).  The
Vendor Contract requires vendors to "collaborate with each other and the City, assist[] in
creating a welcoming environment for all who attend the Market and . . . represent

themselves in a professional manner that reflects their commitment to the Market's mission and customer satisfaction."  (Handbook at 19).

The Market established a designated location known as "Information Alley" for those wishing to distribute information.  (*Id.* at 17).  The 2019 Informational Table Policy governed Information Alley and those interested in setting up a table to distribute information.  (Paula McDevitt Decl., Ex. B, Information Table Policy).  In order to obtain a space in Information Alley, applicants were required to pay a one-time $10 registration fee.  (*Id.* at 1).  If anyone set up a booth or distributed information outside the Market area, they were not subject to the Information Table Policy.  (McDevitt Decl. ¶ 8).

Sometime around May 2019, non-parties to this litigation discovered Dye's membership in Identity Evropa and the American Identity Movement, and Dye and Mackey were "doxed"[1] on June 1, 2019.  (Filing No. 60-2, Dep. of Sarah Dye ("Dye Dep") at 38–39; *Id.*, Ex. L, Elletsville Speech Notes).  Shortly thereafter, Bloomington community members formed No Space for Hate to oppose white supremacy and Schooner Creek's presence at the Market.  (Filing No. 60-8, Dep. of John Hamilton ("Hamilton Dep.") at 44-45).

The first protestors showed up at the Market on June 8, 2019.  (Filing No. 60-3, Dep. of Douglas Mackey ("Mackey Dep.") at 17).  A "handful of people" stood in front of Schooner Creek's booth, told other Market patrons not to buy from Schooner Creek,

---

[1] "Doxing" refers to publicly identifying someone or publishing private information about someone as a form of punishment or revenge.  *See* www.merriam-webster.com/dictionary/dox (last visited Dec. 3, 2021).

called Mackey a Nazi, and generally harassed him. (*Id.* at 20). Marcia Veldman approached a Bloomington Police Department ("BPD") officer to ask for his assistance in stopping one of the protestors from handing out flyers. (Filing No. 60-5, Dep. of Marcia Veldman ("Veldman Dep.") at 55). The officer responded that he was there to protect people and property, not to enforce market rules. (*Id.*). Veldman spoke to the protestor for 45 minutes and attempted to get him to relocate to Information Alley but was unsuccessful and believed she had no further recourse. (*Id.* at 80). Protestors returned to the Market on June 15, 2019, to flyer and encourage the boycott of Schooner Creek. (McDevitt Decl. ¶ 11). Market staff did not stop the protestors because they believed the First Amendment protected the protestors' activity. (*Id.*). Protestors appeared at Market every day that the Market was open for the remainder of 2019. (Dye Dep. at 299).

On June 17, 2019, the City received a petition signed by more than 200 individuals and co-signed by seven local organizations seeking Schooner Creek's expulsion from the Market. (Filing No. 1, Compl. ¶ 23; Dye Dep., Ex. U ("Petition")). Shortly thereafter, on June 20, 2019, Mayor Hamilton issued the following statement, which the court sets out in full:

> Recent allegations about a vendor at our City's farmers market having white-supremacist affiliations have alarmed and activated our community. Including me, personally and as Mayor. I join the vast majority of Bloomingtonians in abhorring and unequivocally condemning the odious doctrine of white supremacy. We know how important speaking out against hate is these days, with events and statements in our country and around the world seeming to open the door for hateful ideologies.

We know too that today's progressive Bloomington has grown through our 200-year history in a soil laced with the toxin of racism. Like our state and country, our community was long home to both overt and covert white supremacy, in our laws, culture and mores. Generations have struggled together to make progress in Bloomington, to eliminate many legacies that persist. We know much remains to be done, and that we must redouble our efforts to stand together and affirm our belief in inclusion and welcoming and opportunity for ALL.

That's why it's so important to respond -- together and directly -- to racism whenever and wherever it appears. We report hate and bias incidents, annually compiled and published by our City's Human Rights Commission. Our community teems with individuals and organizations that work every day to weave that big, wide welcome mat that we want to be as real and inclusive as it should be.

One place where that welcome mat is vital is at the Bloomington Community Farmers Market, where, for decades of Saturday mornings, residents and visitors have gathered for fellowship and community-building along with their fruits and vegetables. The City has run the market through those years, explicitly committed to offering a space "where all can feel welcome and safe regardless of race, religion, color, national origin, ancestry, sex, disability, sexual orientation, gender identity, veteran status, housing status, or disability status" (as stated in the vendor handbook).

The City will not tolerate any vendor displays or behaviors at the market inconsistent with that fundamentally welcoming environment. We will vigorously protect against any behaviors that threaten those values. On the other hand, we must also comply with the US Constitution's First Amendment, which prohibits governments from restricting individuals' rights to believe and speak as they choose, within very wide ranges, including those who sell at (or attend) a City-run farmers' market.

Repeatedly and consistently throughout the last century, the US Supreme Court has said that government may not silence or punish people for disfavored beliefs, in cases involving viewpoints including Communists, anarchists, civil rights

protesters, and Nazis. Our constitutional government's prescription for odious speech isn't government control or censorship. It's MORE SPEECH. That is, our community, including this Mayor, can make clear our values, even when our government cannot directly intervene.

That's why it's vital that individual Bloomingtonians and groups are stepping up and making their presence known at the market. To stand against hate and bigotry. Period. To welcome and embrace people without regard to all those characteristics used throughout history and still today to divide us one from another. To spend our money thoughtfully, knowing who we are buying from and how our purchases affect the wider world.

That's why as Mayor I want to make clear my loud condemnation of racism and bigotry, and my commitment to do all we can to keep working together to pull them out, root and branch, from our common soil. They and their descendants, privilege and implicit bias, continue to fester, demanding our vigilance and energies every day.

(Filing No. 60-9, Hamilton Resp. to Req. for Admis. No. 1 & Ex. A ("June 20, 2019 Remarks")).

Schooner Creek did not attend the Market on June 22, 2019, but protestors carrying signs encouraging the boycott stood in Schooner Creek's empty vending space and spoke with Market patrons. (McDevitt Decl. ¶ 12). Market staff again felt that the First Amendment prevented them from taking any action, so they did not confront the protestors. (*Id.*). At this point, the Bloomington Parks Department determined that it was necessary to secure police assistance with the Market situation, so by June 24, 2019, BPD agreed to assist Market staff in enforcing the Market rules and to arrest violators for criminal trespass and disorderly conduct. (*Id.* ¶¶ 13–14).

On June 27, 2019, the Parks Department published a document titled,
"Clarification of Long-standing Rules of Behavior." (*Id.* ¶ 15 & Ex. F ("Market Rules")).
That document provided, in part, that: (1) interruption of commerce was prohibited; (2)
interrupting the market by "yelling or causing a scene" was not permitted; (3) Market
staff will ask anyone causing a disruption to move to the area designated for free speech;
(4) non-compliance would lead to Market staff contacting BPD; and (5) Bloomington
police officers will reiterate the request to move, and further non-compliance could lead
to arrest. (Market Rules). Market staff were instructed that they were expected to
enforce these rules and that BPD would assist them, if necessary. (McDevitt Decl. ¶ 17).

Tensions escalated over the following weeks. On July 20, 2019, a group of
protestors, referred to as "black bloc," stood quietly in front of the Schooner Creek booth.
(*Id.* ¶ 19). Market staff contacted BPD, who asked the protestors to disperse, which they
did. (*Id.*; *id.*, Ex. H, Incident Report). The next week, on July 27, 2019, members of the
Three Percenters visited the Schooner Creek vending space, in addition to the protestors.
(Dye Dep. at 98-104). Several people were armed with knives and what appeared to be
guns. (*Id.* at 101; Veldman Dep. at 29-30). Parks Department Community Events
Manager Leslie Brinson asked those congregating in front of the vending space to
disperse, but a woman named Cara Caddoo refused, so she was arrested by BPD.
(McDevitt Decl. ¶ 24 & Ex. I, Incident Report).

In response to the growing tension and safety concerns, the City announced on
July 29, 2019, that the Market would be suspended for two weeks. (Filing No 73-9,

Market Suspended Press Release).  Mayor Hamilton held a press conference a couple

days later on July 31, 2019, and his remarks included the following statements:

> As a community, then, one thing we must do together is fight
> against racism and bigotry and their legacies, wherever they
> arise, including at our Farmers' Market. Like many, I have
> spoken out condemning connections to white supremacy in our
> market. *We know active community members have organized
> education and advocacy campaigns, as well as economic
> responses including boycotts, and I am fully supportive of
> those efforts . . . .*
>
> . . .
>
> *Let me directly address the arrest last Saturday of a protester
> against white supremacy—whose spirit and goals I certainly
> share.* As is widely known, longstanding market rules prohibit
> flyers or placards in certain areas. Protesters have been
> complying with those rules for weeks, leafletting and educating
> at entrances to the market. The First Amendment requires our
> government to enforce this rule in a viewpoint neutral manner,
> regardless of whether a sign advocates something that I as
> mayor, and our government and the vast majority of us
> supports, such as denouncing white nationalism, or whether it's
> a sign we find abhorrent like favoring white nationalism. Or a
> sign for or against a woman's right to choose, or any sign at all.
> That even-handed approach to enforcing market rules
> regarding protest is constitutionally required, and resulted in
> the actions last Saturday.

(Hamilton Resp. to Req. for Admis. No. 5 & Ex. C, Press Conference Statement at 2, 4)

(emphasis added).

While the Market was closed, Paula McDevitt and BPD Captain Scott Oldham

met with Dye.  (Filing No. 60-7, Dep. of Scott Oldham ("Oldham Dep.") at 15, 17; Filing

No. 60-6, Dep. of Paula McDevitt ("McDevitt Dep.") at 47–48).  During that meeting

Oldham and McDevitt suggested that if Dye would feel more comfortable, the City could

relocate her to another vending space in the Market.  (McDevitt Dep. at 47–50).  Captain Oldham also made a vague reference to concern for a potential sniper, while McDevitt mentioned potential issues with pedestrian traffic flow around her booth.  (Oldham Dep. at 24–25; McDevitt Dep. at 49–51; Dye Dep. at 129).  According to Dye, the suggestion to relocate was not about Dye's safety or traffic flow at all, but rather an attempt to push her out of her booth space.  (Dye Dep. at 128–30).  Dye declined the city's request to relocate, and Schooner Creek remained in its original spot for the duration of the 2019 Market.  (*Id.* at 131).

On August 13, 2019, Mayor Hamilton announced that the Market would reopen on August 17, 2019.  (Hamilton Resp. to Req. for Admis. No. 3 & Ex. B, Market Reopening Statement).  At one of the first markets after the reopening, Schooner Creek brought Pete Diezel to the Market to work as a stand assistant.  (Dye Dep. at 145–46; Veldman Dep., Ex. 8, Aug. 30, 2019 Email).  Diezel, who goes by the name "Piet Dietzel," had been doxed as a white supremacist, and there were allegations that he had posted white supremacist flyers around the Indiana University Campus.  (Dye Dep. at 145–46).  Dietzel's presence at Schooner Creek's booth further increased tensions and led to renewed demands that the City expel Schooner Creek from the Market.  (McDevitt Decl. ¶ 28).  On August 30, 2019, Veldman emailed Dye to "ask that [Schooner Creek] not bring Piet Dietzel to [the] stand tomorrow."  (Aug. 30, 2019 Email).  Veldman explained that Dietzel's "presence contributes to an already fraught atmosphere that we are trying to manage and calm down," and she further stated, "[the city] request[s] that you live up to

your vendor obligation to cooperate with the City in creating a welcoming market environment." (*Id.*).

Veldman also requested that Dye attend a meeting with representatives of the City, a couple of vendors, and a mediator from the Community Justice and Mediation Center in Bloomington "to discuss and identify how to foster the welcoming atmosphere" of the Market. (Veldman Dep., Ex. 9, Mediation Email). During the meeting, McDevitt and Phillipa Guthrie, the City's Corporation Counsel, again requested that Dye not bring Dietzel to the Market, but they explained that the City could not prevent her from doing so. (*Id.*; McDevitt Decl. ¶ 30). McDevitt and Guthrie also asked that Dye not post political signs or engage in political speech at the Market, even though Dye had never brought a sign to the Market before. (Dye Dep. at 144, 154). The City made the same request of all vendors because some vendors had inquired about posting signs regarding Schooner Creek's continued presence in the Market. (McDevitt Decl. ¶ 31). Finally, the City asked Dye to refrain from posting content on social media or the Schooner Creek website that would tie the Market to Dye's personal beliefs. (Dye Dep. at 321; Filing No. 73-16, Guthrie Email).

A week later, Plaintiffs' counsel sent a follow-up letter to McDevitt, in which he acknowledged that these "general requests" were made of "not just [Plaintiffs], but each of the vendors at the Farmers' Market." (McDevitt Dep., Ex. 11 at 24–25). He explained that while Plaintiffs had not done any of those activities prior to the meeting, "the City's requests are not unreasonable." (*Id.*). He also noted that the City agreed that Dietzel was allowed to continue working as a stand assistant. (*Id.* at 24).

Beginning on September 21, 2019, protestors began attending the Market wearing purple t-shirts with the words, "Boycott Schooner Creek" printed on the back.  (McDevitt Decl. ¶ 32).  McDevitt and her staff met with the City's legal department to discuss how to respond to these new protestors.  (*Id.* ¶ 33).  Based on these conversations, the Parks Department authorized Market staff to use their judgment in determining whether any conduct violated Market rules.  (*Id.* ¶ 37).  This required Market staff to consider the facts and circumstances of what they observed, including whether the conduct was consistent or inconsistent with conduct that would typically occur at a farmers' market, the number of people involved, the noise level, and where the conduct occurred.  (*Id.* ¶ 38).

On September 28, 2019, protestors wearing "Boycott Schooner Creek" shirts showed up at the Market with purple pieces of cardboard attached to sticks, which resembled signs, but there was nothing printed on the cardboard.  (*Id.* ¶ 41).  The protestors called them "fans."  (*Id.*).  Veldman spoke with the protestors before having BPD disperse them.  (*Id.* ¶¶ 42–44).  On October 26, 2019, Market staff stopped protestors wearing "Boycott Schooner Creek" shirts from playing loud music on a jambox while dancing in the vendor aisles and had them disperse.  (*Id.* ¶¶ 45–47).  The next weekend, November 2, 2019, Market staff and BPD stopped another large group of protestors wearing "Boycott Schooner Creek" shirts and various costumes, including a purple octopus costume, a purple dinosaur costume, and a pink inflatable unicorn costume, from singing and dancing in the vending area.  (*Id.* ¶¶ 48–52).  Finally, on November 9, 2019, Market staff stopped another group of protestors wearing "Boycott Schooner Creek" shirts from singing, dancing, and carrying signs in the vending area.

11

(*Id.* ¶¶ 53–62).  BPD arrested five people who refused to disperse after being warned.
(*Id.* ¶¶ 60–62).

Despite all of this, Schooner Creek applied for and participated in the 2020 Farmers' Market, and they operated in a vending space adjacent to the space they had in 2019.  (Dye Dep. at 166–67, 195–96).  Another vendor who had accumulated more vendor points selected Schooner Creek's 2019 vending space.  (*Id.* at 195).  Schooner Creek was also accepted to participate in the 2021 Market.  (McDevitt Decl., Ex. Z, 2021 Farm Vendor Contract).

## II.     Legal Standard

Summary judgment is appropriate when the moving party demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Carroll v. Lynch*, 698 F.3d 561, 565 (7th Cir. 2012).  "A genuine dispute of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III.    Discussion

Plaintiffs bring claims under the First Amendment, the Equal Protection Clause, the Due Process Clause, and Article I, Section 9 of the Indiana Constitution.  Defendants seek summary judgment on each of Plaintiffs' claims, and the court takes Defendants' arguments in the order presented.

### A.     Schooner Creek Farm Lacks the Capacity to Sue

As a sole proprietorship, Schooner Creek Farm is not a legal entity and lacks the capacity to sue.  (Dye Dep. at 23); *see Bartlett v. Heibl*, 128 F.3d 497, 500 (7th Cir. 1997) ("A sole proprietorship . . . is not a suable entity separate from the sole proprietor."). Plaintiffs did not respond to Defendants' argument, so any opposing argument is waived. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010).  Accordingly, summary judgment is **GRANTED** on all claims brought by Schooner Creek Farm.

### B.  Summary Judgment Is Inappropriate Based on the Contract

Defendants reiterate their argument that Plaintiffs' claims are barred by the Covenant Not to Sue and the Liability and Indemnity provision in the Vendor Contract. (Contract ¶¶ 8, 10).  The court already addressed these arguments in its entry denying Plaintiffs' motion for partial summary judgment, and the court incorporates that reasoning here.  In short, Plaintiffs' claims fall within the Covenant Not to Sue, but the Liability and Indemnification provision does not apply to claims brought by a vendor against Defendants.  However, even with the more robust record presented here, the court cannot determine whether the Covenant Not to Sue is enforceable because there is insufficient evidence that Plaintiffs knowingly and voluntarily waived their constitutional claims. Defendants are not entitled to summary judgment based on the Vendor Contract.

### C.  Plaintiffs' Section 1983 Official Capacity Claims Are Redundant in Light of Plaintiff's Claims Against the City of Bloomington

Plaintiffs sued Mayor Hamilton, McDevitt, and Veldman in their individual and official capacities.  Official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent."  *Kentucky v.*

*Graham*, 473 U.S. 159, 165 (1985).  Because Plaintiffs also sued the City of

Bloomington, and the City received notice and adequately responded, Plaintiffs' official

capacity claims are to be treated as claims against the City.  *Id.*  The official capacity

claims are, therefore, redundant.  Accordingly, summary judgment is **GRANTED** on all

Section 1983 official capacity claims against Mayor Hamilton, McDevitt, and Veldman.

### D.     Defendants Did Not Violate the First Amendment

Turning now to Plaintiffs' First Amendment claims, Plaintiffs allege Defendants

engaged in viewpoint discrimination, imposed a content-based prior restraint on

Plaintiffs' speech, and forced Plaintiffs to disassociate with Dietzel.  The record shows

that Defendants did not violate Plaintiffs' First Amendment rights.

#### i.     Viewpoint Discrimination

Viewpoint discrimination is an "egregious form of content discrimination," and

governments may not regulate speech when "the specific motivating ideology or the

opinion or perspective of the speaker is the rationale for the restriction."  *Rosenberger v.*

*Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995).  According to Plaintiffs,

Defendants engaged in viewpoint discrimination by waiving the $10 Information Alley

fee for No Space for Hate but imposing a fee on Plaintiffs if they were to apply for a

space in Information Alley; prohibiting Plaintiffs' speech in the Market while endorsing

that of the protestors; and selectively enforcing the Market's time, place, and manner

restrictions based on the perceived viewpoint of the speaker.

To begin, Plaintiffs cannot make out a First Amendment claim based on the

Information Alley fee waiver allegation.  Defendants did not waive a fee for No Space for

Hate; the organization set up a booth on a bicycle/pedestrian path outside the Market's boundaries, so they were not charged a fee.  (McDevitt Decl. ¶¶ 7–8).  And at no time did Schooner Creek attempt to register for a space in Information Alley.  (Dye Dep at 196–97).  The allegation that Plaintiffs would be required to pay a rental fee "if [they] were to utilize" a space is purely speculative.  (Compl. ¶ 58).  While the court draws all reasonable inferences in Plaintiffs' favor, "[the court's] favor toward the nonmoving party does not extend to drawing '[i]nferences that are supported by only speculation or conjecture.'"  *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (citation omitted).

Defendants did not otherwise engage in viewpoint discrimination.  At no time prior to the September 12, 2019 meeting between the City and Plaintiffs did Defendants request that Plaintiffs not post any political signs, and that request was made of *all* vendors.  (McDevitt Decl. ¶ 31).  Plaintiffs' counsel even acknowledged this general request was made of all vendors.  (McDevitt Dep., Ex. 11 at 24–25).  As for the claim that the City endorsed the message of the protestors, which will be discussed in further detail in the equal protection section below, government entities are not prohibited from favoring one viewpoint over another.  *See Matal v. Tam*, 137 S. Ct. 1744, 1757 (2017) ("When a government entity embarks on a course of action, it necessarily takes a particular viewpoint and rejects others. The Free Speech Clause does not require government to maintain viewpoint neutrality when its officers and employees speak about that venture.").

Contrary to Plaintiffs' suggestion, the record before the court reveals that the City regularly enforced the Market Rules.  Market staff repeatedly asked protestors to disperse when they violated the Market Rules by disrupting commerce or yelling and causing a scene.  (McDevitt Decl. ¶ 19 (black bloc protestors on July 20, 2019); *id.* ¶¶ 41–44 (protestors carrying "fans" in the Market); *id.* ¶¶ 45–47 (protestors playing music and dancing in the aisle on October 26, 2019); *id.* ¶¶ 50–52 (protestors dancing and performing on November 2, 2019).  BPD arrested Cara Cadoo on July 27, 2019 after she refused to disperse and stop carrying a sign.  (McDevitt Decl. ¶¶ 24–25).  In total, BPD arrested six protestors.  (McDevitt Dep. at 64).

The instances where the City did not act were precisely to avoid violating the First Amendment.  The Market Rules address disruptive conduct regardless of the message or viewpoint expressed.  So, when a protestor's conduct violated the Market Rules—such as carrying "fans" with no words written on them, or blocking access to Plaintiffs' booth— the Market staff intervened.  But when the protestors merely carried a message on their shirts without engaging in disruptive conduct—such as wearing a purple shirt with "Boycott Schooner Creek" printed on the back—Market staff could not act without doing so based solely on the viewpoint of the message; the City would have no cause to intervene if the shirts had a message unrelated the controversy or no message at all. Plaintiffs have not pointed to instances when these protestors disrupted commerce by their conduct—other than the instances when Market staff intervened—and Market staff would be no more legally entitled to evict individuals wearing "Boycott Schooner Creek" shirts than it could evict someone wearing a shirt with "Fuck the Draft" printed on it. *See*

16

*Cohen v. California*, 403 U.S. 15, 18 (1971) (finding unconstitutional state prosecution for disturbing the peace by wearing jacket with "Fuck the Draft" on it where "[t]he only 'conduct' which the State sought to punish is the fact of communication," and "[a]t least so long as there is no showing of an intent to incite disobedience to or disruption of the draft, [Plaintiff] could not, consistently with the First and Fourteenth Amendments, be punished for asserting the evident position on the inutility or immorality of the draft his jacket reflected").  The record does not support Plaintiffs' contention that Defendants engaged in viewpoint discrimination.

### ii.    Content-Based Prior Restraint

Plaintiffs next contend that Defendants' prohibition on displaying political signs or engaging in political discourse at the Market constitutes a content-based prior restraint. A prior restraint is any "administrative [or] judicial order[] *forbidding* certain communications when issued in advance of the time that such communications are to occur." *Samuelson v. LaPorte Cmty. Sch. Corp.*, 526 F.3d 1046, 1051 (7th Cir. 2008) (quoting *Alexander v. United States*, 509 U.S. 544, 550 (1993)) (emphasis in original).  A restriction qualifies as a prior restraint if: "(1) the speaker must apply to the decision maker before engaging in the proposed communication; (2) the decision maker is empowered to determine whether the applicant should be granted permission on the basis of its review of the content of the communication; (3) approval of the application requires the decision maker's affirmative action; and (4) approval is not a matter of routine, but involves 'appraisal of facts, the exercise of judgment, and the formation of an opinion' by

the decision maker." *Id.* (quoting *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 554 (1975)).

Defendants did not impose a prior restraint on Plaintiffs' speech.  First, at no time did Plaintiffs request or attempt to bring a sign to the Market.  (Dye Dep. at 154–55). As the record shows, Defendants "requested" that Plaintiffs—and all vendors—refrain from posting political signs and engaging in political discourse within the Market.  After the September 12, 2019 meeting, Plaintiffs' counsel sent a follow-up letter to McDevitt, in which he acknowledged that the City had made these "general requests" of "not just [Plaintiffs], but each of the vendors at the Farmers' Market."  (McDevitt Dep., Ex. 11 at 24–25).  He explained that while Plaintiffs had not done any of those activities prior to the meeting, "the City's requests are not unreasonable."  (*Id.*).  Plaintiffs themselves characterized these "requests" as such in their Complaint.  (Compl. ¶ 46 ("At the mediation, the City *requested* that [Plaintiffs] refrain from posting political signage in its vending space."; *id.* ¶ 48 ("At the mediation, the City *requested* that [Plaintiffs] refrain from advocating for any political position in a manner that would suggest the position is endorsed by the Market."; *id.* ¶ 50 ("At the mediation, the City *requested* that [Plaintiffs] refrain from any political discourse of any kind at the Market, unless the discourse was restricted to the Information Alley.") (emphases added)).  These acknowledgments constitute binding judicial admissions.  *Keller v. United States*, 58 F.3d 1194, 1199 (7th Cir. 1995) ("Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them. They may not be controverted at trial or on appeal. Indeed, they are 'not evidence at all but rather have the

18

effect of withdrawing a fact from contention.'") (citation omitted); *see also Jackson v. Marion Cty.*, 66 F.3d 151, 153 (7th Cir. 1995) ("Allegations in a complaint are binding admissions . . . ."). Because Plaintiffs never applied or requested to bring a sign to the market, and there was no judicial or administrative order "forbidding" Plaintiffs from doing so, *Samuelson*, 526 F.3d at 1051, there was no prior restraint on Plaintiffs' speech.

### iii.   Freedom of Association

Plaintiffs' final First Amendment claim concerns their right to freely associate. Plaintiffs allege Defendants demanded and coerced them into terminating their relationship with Dietzel. The record shows that this was not the case.

The First Amendment protects the "freedom of expressive association," which "ensures the right to associate for the purpose of engaging in activities protected by the First Amendment." *Montgomery v. Stefaniak*, 410 F.3d 933, 937 (7th Cir. 2005) (citing *Roberts v. United States Jaycees*, 468 U.S. 609, 617–18 (1984); *Klug v. Chicago Sch. Reform Bd. of Trustees*, 197 F.3d 853, 857 (7th Cir.1999)). The question here is whether associating with Dietzel was for the purpose of engaging in activities protected by the First Amendment. The answer is no.

Veldman emailed Plaintiffs on August 30, 2019 to "ask" that they "not bring Piet Dietzel to [the Schooner Creek] stand tomorrow." (Veldman Dep., Ex. 8, Aug. 30, 2019 Email). According to Veldman, "his presence contribute[d] to an already fraught atmosphere that [Defendants were] trying to manage and calm down." (*Id.*) Veldman further "request[ed] that [Plaintiffs] live up to [their] obligation to cooperate with the City

in creating a welcoming market environment." (*Id.*). Defendants reiterated that request when the parties met on September 19, 2019.

When the parties met, the City acknowledged that the City could not prevent Plaintiffs from bringing Dietzel to the Market. (McDevitt Decl. ¶ 30). Plaintiffs' counsel confirmed that understanding. (McDevitt Dep., Ex. 11 at 24 ("My takeaways [from the meeting] are as follows: . . . The City agrees that my clients' stand assistant, Mr. Dietzel, may continue to operate as a stand assistant within the terms of the Farm Vendor Contract."). Thus, there is no dispute that the City did not demand Plaintiffs to disassociate from Dietzel. But even if that were not the case, having a particular stand assistant work at a farm stand to "document and photograph" the protestors, "bag[] some produce," and "get[] change for someone" does not involve activities protected by the First Amendment. (Dye Dep. at 147). *See Marshall v. Allen*, 984 F.2d 787, 799 (7th Cir. 1993) (noting freedom of association is an "implicit part of the freedoms of speech, assembly, and petition."). Plaintiffs' right to freely associate was not violated in this case.

Summary judgment is **GRANTED** on Plaintiffs' First Amendment claims.

### E.      Defendants Did Not Violate the Equal Protection Clause

Turning next to Plaintiffs' equal protection claims, Plaintiffs allege that Defendants selectively enforced the Market's time, place, and manner restrictions so as to force Schooner Creek to leave the Market. Plaintiffs claim protestors were allowed to pass out political materials in Schooner Creek's vending space while Plaintiffs were prohibited from doing so; other vendors were permitted to display political signage while

Plaintiffs were not; and the City singled them out as the cause of the controversy.  The record, however, does not support Plaintiffs' claims.

The equal protection clause protects individuals from governmental discrimination.  *Swanson v. City of Chetek*, 719 F.3d 780, 783 (7th Cir. 2013).  While the typical equal protection claim involves discrimination on the basis of a protected class—race, sex, or national origin—the clause "also prohibits the singling out of a person for different treatment for no rational reason."  *Id.*  Plaintiffs do not fall within a protected class, so they are left to pursue a class-of-one claim.  "To state a class-of-one equal protection claim, an individual must allege that he was 'intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'"  *Id.* at 783–86 (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).  Plaintiffs cannot satisfy either requirement.

First, Plaintiffs are not similarly situated to the protestors.  Plaintiffs signed a contract in which they agreed to comply with the Market rules and "collaborate with . . . the City" to "creat[e] a welcoming environment for all who attend the Market . . . ." (Handbook at 19).  The protestors were not subject to that requirement because they did not sign a contract.

Second, Plaintiffs were not treated less favorably than the protestors.  It was not until the September 12, 2019 meeting that the City requested that vendors refrain from posting political signs.  (McDevitt Decl. ¶ 31; McDevitt Dep., Ex. 11 at 24–25).  Because the City had not made that request when the protestors occupied the Schooner Creek

vending space on June 22, 2019, the protestors were not treated more favorably than Plaintiffs when the City allowed them to remain.

As for the City's treatment of other vendors, the City requested that *all* vendors refrain from posting political signs.  (McDevitt Decl. ¶ 31).  Plaintiffs' counsel acknowledged this general request was made of all vendors, (McDevitt Dep., Ex. 11 at 24–25), and Plaintiffs have not introduced any evidence that other vendors defied that request after the September 12, 2019 meeting.  Rather, Plaintiffs point to the meeting with the City as evidence that they were singled out and specifically restricted from posting signs in the Market.  It is true that they were the only vendor asked to attend the mediation with the City, but they were also the only vendor at the center of the controversy.  The City had a rational basis for treating Plaintiffs differently than other vendors in this regard.  *See Swanson*, 719 F.3d at 783 (a class-of-one plaintiff must show that there is no rational basis for the different treatment).

To the extent Plaintiffs bring an Equal Protection claim against Mayor Hamilton based on his public comments, that claim fails because Plaintiffs misunderstand the authority of a mayor to speak out on issues.  Plaintiffs challenge Mayor Hamilton's decision to comment on the farmers' market situation in general and the boycotts specifically.  They suggest that Mayor Hamilton endorsed the protestors' message and encouraged a boycott of Schooner Creek.  According to Plaintiffs, the Mayor's comments amounted to an effort to achieve by proxy what it could not do directly: kick Schooner Creek out of the Market.

To be sure, "[i]f the power of government is brought to bear on a harmless individual merely because a powerful state or local official harbors a malignant animosity toward him, the individual ought to have a remedy in federal court." *Esmail v. Macrane*, 53 F.3d 176, 179 (7th Cir. 1995). However, it is not unconstitutional for a public official to speak out about issues affecting the community. A government entity—and by extension, a mayor—"has the right to 'speak for itself.'" *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009) (quoting *Bd. of Regents of Univ. of Wisc. Sys. v. Southworth*, 529 U.S. 217, 229 (2000)). Mayor Hamilton, elected to represent the people of Bloomington, is allowed—indeed, expected—to speak up on issues in the community, and his speech need not refrain from supporting a particular perspective. *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 598 (1998) ("It is the very business of government to favor and disfavor points of view on (in modern times, at least) innumerable subjects—which is the main reason we have decided to elect those who run the government, rather than save money by making their posts hereditary.") (Scalia, J. concurring); *see also Pleasant Grove City*, 555 U.S. at 467–68 ("[The government] is entitled to say what it wishes and to select the views that it wants to express.") (internal quotations and citations omitted).

In expressing his opposition to white supremacy and support for the protestors' advocacy and education efforts, Mayor Hamilton was not conducting "an orchestrated campaign of official harassment directed against [Plaintiffs] out of sheer malice," *Esmail*, 53 F.3d at 179, and nothing in the record demonstrates that his comments were "a spiteful effort to 'get' [Plaintiffs] for reasons wholly unrelated to any legitimate state objective,"

*id.* at 180.  Rather, Mayor Hamilton was responding to a rapidly escalating controversy that had been instigated by members of the community, and he explained that boycotts are a legitimate, constitutionally permissible method for responding to the controversy. (*See, e.g.,* June 20, 2019 Remarks).

Summary judgment is **GRANTED** on Plaintiffs' equal protection claim.

### F.     Defendants Did Not Violate the Due Process Clause

Defendants next argue they are entitled to summary judgment on Plaintiffs' Due Process claims because they did not deprive Plaintiffs of any constitutionally protected liberty or property interest.  Plaintiffs failed to respond to those arguments, so any opposing argument is waived.  *See Bonte*, 624 F.3d at 466.  But Plaintiffs' silence also makes it difficult to understand the basis for their claims.  The Complaint alleges that the Market Rules were so vague that they failed to give sufficient guidance for Market staff, vendors, or patrons to know whether certain behavior is prohibited.  *See F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required.").  The Complaint also alleges that Defendants deprived Plaintiffs of their property right in its vending space without due process.

First, the Market Rules are not unconstitutionally vague.  They prohibited the "interruption of commerce" and interrupting the market by "yelling or causing a scene." (Market Rules).  In enforcing the Market Rules, Market staff were instructed to consider the facts and circumstances of what they observed, including whether the conduct was consistent or inconsistent with conduct that would typically occur at a farmers' market,

24

the number of people involved, the noise level, and where the conduct occurred. (McDevitt Decl. ¶¶ 37–38).  While this may not provide the degree of case-by-case specificity that would ensure perfect clarity, regulations need not meet that standard to avoid being unconstitutionally vague.  *See Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989) ("While these standards are undoubtedly flexible, and the officials implementing them will exercise considerable discretion, perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.") (upholding city noise guideline whose goals were to "provide the best sound for all events" and to "insure appropriate sound quality balanced with respect for nearby residential neighbors and the mayorally decreed quiet zone of [the] Sheep Meadow"); *see also Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) ("Condemned to the use of words, we can never expect mathematical certainty in our language.").  The Market Rules provide sufficient guidance to Market staff, vendors, and patrons such that those of common intelligence need not guess at the Rules' meaning or scope, and they do not invite arbitrary enforcement.  *Fox Television*, 567 U.S. at 253.  Summary judgment is **GRANTED** on Plaintiffs' deprivation of liberty claim.

Nor were Plaintiffs deprived of a property right in their vending space.  They remained in their vending space, C-8, for the duration of the 2019 Market.  (Dye Dep. at 131).  Vendors do not retain a future interest in a particular vending space; they must reapply for each Market season.  (Handbook at 3; McDevitt Decl., Ex. E (Schooner Creek 2019 Contract) at 3 (contract termination date of November 30, 2019)).  When Plaintiffs applied for—and were accepted into—the 2020 Market, another vendor with more points

reserved the space Plaintiffs had used in 2019.  (Dye Dep. at 166–67, 195–96).  So Plaintiffs rented their second choice, C-7, which was adjacent to their old space. Summary judgment is **GRANTED** on Plaintiffs deprivation of property claim.

### G.    Defendants Are Protected by Qualified Immunity

Qualified immunity protects government actors from civil liability when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (internal quotation and citation omitted). The applicability of qualified immunity turns on two well-known questions: "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Gill v. City of Milwaukee*, 850 F.3d 335, 340 (7th Cir. 2017).  Courts may address these questions in either order, but if either question is answered in the negative, qualified immunity applies. *Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2021).

"A clearly established right is one that is sufficiently clear that every reasonable official would understand that what he is doing violates that right." *Mullenix*,  577 U.S. at 11.  Whether a right is clearly established "should not be defined at a high level of generality." *Gill*, 850 F.3d at 340 (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)). Rather, "the clearly established law must be 'particularized' to the facts of the case." *Id.*

26

(quoting *White*, 137 S. Ct. at 551). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *Mullenix*, 136 S. Ct. at 308)).

Based on record here, Defendants are entitled to qualified immunity because, even assuming Plaintiffs' constitutional rights were violated, those rights were not clearly established under the particular circumstances presented. The law was not sufficiently clear that a reasonable official in Defendants' shoes would have known that their manner of enforcing the Market Rules violated Plaintiffs' First and Fourteenth Amendment rights, particularly when balanced against the protestors' First Amendment rights. Nor was the law sufficiently clear that Defendants could not make a general request of all vendors that they not bring signs to the Market or that a vendor not bring a particular stand assistant to the Market given the fraught conditions.

This conclusion is buttressed by Plaintiffs' inability to point to a closely analogous case that would have placed Defendants on notice that their actions were unlawful. *See Est. of Escobedo v. Bender*, 600 F.3d 770, 780 (7th Cir. 2010) (explaining a plaintiff can demonstrate a right was clearly established by presenting a closely analogous case establishing that the defendant's conduct was unconstitutional). And this is not one of the "rare" cases where the constitutional violations are so plain that Plaintiffs are not required to point to an analogous case establishing the rights at issue. *See Denius v. Dunlap*, 209 F.3d 944, 951 (7th Cir. 2000). Defendants faced tense, rapidly evolving, and, at times, potentially violent conditions throughout the summer of 2019. Week after week, protestors adopted new methods of protest that forced Defendants to respond in a way

27

that complied with the Constitution.  Rather than showing Defendants were "plainly incompetent" or "knowingly violate[d] the law," *Mullenix*, 577 U.S. at 12, the record demonstrates that Defendants reasonably attempted to balance public safety, the rights of the protestors, and the rights of Plaintiffs.  Even if Defendants may have violated Plaintiffs rights in some instances, the court cannot conclude that reasonable officials in Defendants' position would have known that they could not respond as Defendants did.

Plaintiffs point to various comments by Defendants where they acknowledge the First Amendment's limitations on how they can respond as evidence that Defendants knowingly violated Plaintiffs' rights.  However, the mere fact that Defendants recognized the existence of potential First Amendment issues does not demonstrate that they knowingly violated the law.  On the contrary, it shows that they understood the limitations the First Amendment imposed and that they took steps to *avoid* violating the First Amendment.  Moreover, while the general prohibition on viewpoint discrimination, the right to hold unpopular beliefs,[2] the protection of the right to freely associate, and the right to due process have been recognized for decades (or longer), it is not the general existence of the right that matters for qualified immunity purposes.  Rather, it is whether the right was clearly established under the particularized facts of the present case.  *Gill*, 850 F.3d at 340.  Plaintiffs' characterization of the rights at issue is "precisely the type of 'high level of generality' the Supreme Court has rejected in the qualified immunity context."  *Id.* at 341.

---

[2] To be clear, the court makes no finding regarding the truth of the allegations that Plaintiffs hold white supremacist beliefs.

Based on those conversations, McDevitt and the Parks Department determined that they should continue their approach: monitor the vendor area, keep the area in front of Plaintiffs' booth clear and accessible, and address disruptions to commerce. (McDevitt Decl. ¶¶ 33–40). As explained above, Market staff were authorized to use their judgment in deciding whether conduct impeded access to Plaintiffs' booth or disrupted commerce, and they were to consider factors such as whether the conduct was consistent with conduct that typically occurs in a farmer's market, the number of people involved, the noise level, and where the conduct occurred. (*Id.* ¶ 37–38). In light of those considerations, and based on input from the legal department, it was determined that walking up and down the aisles of a farmers' market and congregating in small groups and talking are consistent with normal market activity, notwithstanding the protestors' "Boycott Schooner Creek" shirts. (*Id.* ¶¶ 39–40).

The record demonstrates that Bloomington officials faced a challenging situation throughout the summer of 2019. A reasonable official facing the particular facts of this case could reasonably have believed that their conduct was permissible. Defendants are entitled to qualified immunity on each of Plaintiffs' federal claims.

### H.    Plaintiffs' Indiana State Law Claim Fails

Finally, the court reaches Plaintiffs' claim under Article I, Section 9 of the Indiana Constitution, which provides: "No law shall be passed, restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever: but for the abuse of that right, every person shall be responsible." Defendants argue they are entitled to summary judgment on this claim because "Indiana courts do not

recognize a private cause of action for money damages arising from the violation of the Indiana Constitution." *Jones v. City of Lawrenceburg*, No. 4:14-CV-00099-RLY-TAB, 2018 WL 3630283, at *4 (S.D. Ind. July 31, 2018) (citing *Smith v. Ind. Dept. of Correction*, 871 N.E.2d 975, 986 (Ind. Ct. App. 2007)).

This argument fails because Plaintiffs do not seek money damages; they seek a declaratory judgment.  Regardless, Defendants are entitled to summary judgment for the reasons already set forth above.  Defendants did not restrain the free interchange of thought and opinion or restrict Plaintiffs' right to speak.  Summary judgment is **GRANTED** on Plaintiffs' claim under the Indiana Constitution.

## IV.   Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment (Filing No. 59) is **GRANTED**.  Plaintiffs' Motion for Oral Argument (Filing No. 81) is **DENIED as MOOT**.

**SO ORDERED** this 19th day of January, 2021.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.